The next case for argument is United States v. Popov. Counsel? Good morning. May it please the Court. I'm Karen Landau, and I represent Alexander Popov. As you know, this is a sentencing appeal. The amount of loss is the biggest and most determinative factor in fraud sentencing. And the guidelines require – they suggest, of course, that they use the greater of intended or actual loss. But in this case, loss was actually based on a fiction, a fiction that the total amount billed to Medicare is the actual – is the intended loss. And there are several reasons why that cannot be the case and why the case should be remanded for sentencing based on the allowed – at most the amount, the total amount allowed by Medicare, and at least 80 percent of the allowed amount. And, frankly, it doesn't matter because it's in the same guideline range cutoff anyway. Everyone who bills Medicare knows that Medicare doesn't pay what's billed. You're supposed to bill the total amount, but Medicare doesn't pay it. Medicare pays based on set schedules, and they pay 80 percent of the set schedules. They don't pay for certain services. And as a result, a lot of Medicare bills are rejected, either outright or they're paid for much amounts that were substantially – are substantially less than the billed amount. Sometimes they're 20 percent of the amount billed. But it's all based on Medicare, and people who bill Medicare know that. Providers who have contracts with Medicare know that. Part of the deal when you sign up with Medicare is that you agree to accept reimbursement based on Medicare's allowed schedules, that you're going to get 80 percent and you can seek another 20 percent from the patient. And I think you could ask people both in the medical profession and outside the medical profession, and most people would say, yeah, Medicare doesn't pay that much, right? So in this case, what we are basing intended loss on is something that is entirely fictional, because Dr. Popov, along with the other defendants, knew they weren't going to get the amount that was billed. Roberts, Jr. Can I ask you this? Kagan, Kagan Sure. Roberts, Jr. I mean, I think we got a good handle on how things played out. But so let's say that we agree with you that the framework we should adopt is the framework that, I guess, it's the Fourth and the Fifth Circuits most explicitly have adopted, that the amount – Kagan The suggestion, yeah. Roberts, Jr. I mean, the amount billed is prima facie evidence of the intended loss, but the defendant gets the opportunity to come in with evidence to rebut that. Kagan Right. Roberts, Jr. Both you and Dr. – I mean, your client and Dr. Prakash seem to have had that opportunity. Should we read the record as suggesting that the district court must have implicitly found that you just didn't produce enough evidence to rebut the presumption? Kagan No, I don't think so. First of all, I know that Dr. Prakash had a more extensive sentencing because he had new counsel at sentencing, whereas my client did not. My client did not present evidence, and I think that the Court – well, I guess there's two answers to that question. First, if the Court made a finding – first, it's pretty clear from the record, in my opinion, that the Court said, I'm going to use the bill to mount, and this is the – because he adopted the pre-sentence report, and that's what the pre-sentence report said. There was evidence in the record that showed that Dr. – because the government presented it, that, you know, that – about what Medicare paid, and I think the Court just said, hey, it doesn't matter, you know, that basically I'm using – and that's what the government argued for. The government said, you know, you have – you should calculate loss based on intended loss. So I don't think that the Court implicitly made a finding of the one that you're suggesting, that I had – that my client had the opportunity to rebut it and he didn't show enough. I don't think the Court made that finding. Alitoso, because you never argued that you had rebutted it? Well, they did argue that he didn't – defense counsel – I'm sorry. So you were not – I was not. No, no. I'm an appellate attorney only, so – but what I can say is defense counsel objected to the loss amount as being based on intended loss and said that it should be the 80 percent of the allowed amount. Actually, he said it should be the actual loss, which was 283, because he felt that it should be limited to Dr. Popov's billings. I have not made that argument. I feel I – I – anyway. But – but so he did object, and I will concede that he did not spell out the argument in the best possible way, but this is a legal – I mean, I would say – But I'm trying to get a handle on – are you making – are you saying that the district court applied the wrong legal framework and we should review that de novo and send it back because – Yes, that is what I'm saying. I'm saying – I guess I could read the record just as easily as saying, well, your client had the opportunity to – to rebut the presumption. The district court, we have to assume, followed the right framework, but just made a – a factual finding that your client didn't produce enough to rebut the presumption, and we would review that only for clear error, I think. Correct. You're correct on the standard of review. I don't think that's – first of all, I guess let me make two alternative points. First, I don't think that's what happened. I think the court said, no, we're using the billing and that's it, period. Second, and partly because the sentencing memorandum didn't go through the whole litany that I – you know, if my client had the opportunity to make the showing and perhaps a better showing could have been made, then I think the – if there is an implicit finding, which is I think what you're suggesting, it is clear error, because the government has the burden of proof. And what the government did was to adopt the framework you guys are asking us to adopt. Your client has the burden of rebutting the presumption. The government met its burden by producing that. But I'm not even conceding that there should be a presumption. I guess that's – that's the Fourth and Fifth Circuits that both held. You're not – now you're saying that we shouldn't follow those? I am suggesting that there shouldn't be a presumption in a case like this at all. I'm not – I'm not urging you – I mean, I have cited those cases as helpful and I think they are, but I – I think it's completely wrong to have a presumption that this is the loss and that you have to rebut it because underlying the government has the burden of proof on loss. So if that is the point, then – and that goes for intended loss, too. Certainly, the government can put – can point to the total billings as evidence of intended loss. But does that – is that enough to shift the presumption? I'm not sure that it is. That's what those other – well, just so you – that is what those other circuits hold. Right. But let me ask you this. Why wouldn't we adopt that? Because if your client bills Medicare for the full amount and Medicare sent a check for 100 percent of the billed amount, your client wasn't going to send that money back, right? Of course not. Right. So he intended to get as much as he could, and the fact that, well, it was highly unlikely that you're going to get 100 cents on the dollar is neither here nor there. The guidelines tell us that. Correct. So I don't – I mean, what's your argument for why we shouldn't at least adopt the framework that the Fourth and Fifth Circuits have? I guess – I guess the argument is that – well, the point is, is that I guess it's – I think it's troubling for the district court to apply any kind of – I guess if it's a rebuttable presumption, there's a better argument for it. As a criminal defense attorney, I have to concede I'm very uncomfortable with the idea of having any presumption at all. Well, let's suppose you – let's talk about Medicare. What – should there be a presumption that the amount billed for is the amount intended in the absence of factual evidence, or shouldn't there be an equal presumption that in the Medicare case, it's not the intended amount, because everybody knows that? If the doctor had gotten up and said, no, I knew nobody in Medicare gets 100 percent, so I intended to get 70 percent, that, I gather, would have rebutted it. Shouldn't there be a presumption, since everybody knows you're not going to collect what the billed amount – you bill that amount if you hope to get 70 percent, or whatever? It would seem you could make a reasonable argument, whether that's consistent with the Fourth and Fifth Circuit or not. You could make a reasonable argument that there ought to be a presumption that rebutts that, the original presumption, if the original presumption is correct. That that – that if everybody knows you're not intending to collect it and you're not going to, and we're making some law, you don't seem to be advancing that. You seem to be accepting the idea, which may be right, you may be compelled to accept the idea, that there has to be an actual factual rebuttal in each case, that the doctor who practices Medicare fraud for a living knows that if he wants to get $50,000, he puts in for 75. Should the outcome of these cases depend on which one got up and said that and which one didn't? Well, no, Your Honor, and I agree with you, and I think that as usual, you've made my point so much better than I ever could. I think that – I think that that's exactly right, that at least when we're talking about Medicare fraud and perhaps to some extent certain kinds of insurance fraud, I don't know, but at least when we're talking about Medicare, there's got to be, there should be, if there's a presumption that – I guess that's why I'm uncomfortable with the idea that the total amount billed is that there's a presumption that that's intended loss, because in Medicare that is just not true. Well, but counsel, even if it's not the amount billed, you know, one doctor gets up and says, well, I expect it to get 20 percent. Another doctor says, I expect it to get 10 percent, or another one says 40 percent. That's not much of an evidentiary situation for us either, for the sentencing judge. I mean, look at the three of the doctors here. Dr. Le Chabrier, she got about 46, 47 percent of what she billed back, and Dr. Prakash and Dr. Popoff were at half that, about 23 percent. Why wouldn't the sentencing judge be entitled to say, well, I'm, I think they're entitled, we're going to seek 50 percent, and if they had 50 percent of 2.1 million, they're still over a million and they get the same guideline range. Wouldn't that be a way to resolve it? I don't think it's – no, and I don't think it's the right way to resolve it. I think the point is, is that people who commit Medicare fraud don't know what total they're going to get, but they do know they're going to get paid based on the Medicare schedules, and that's the best evidence of intent, because what they intend to get is 80 percent of the Medicare-allowed amount. And so in this case, that's what should be – now, you know, that should be how you hold them accountable. And you know, that may not be – it's – I think it's the neatest solution, and I think it's the most accurate solution, because that is how Medicare pays. And people know, people who bill Medicare, whether it's fraudulently or legitimately, they know that this is what they're going to get. Can you clarify one thing? Sure. In terms of how this billing works? Let's say that I would normally charge $1,000 for a procedure. If I submit the bill to Medicare, am I getting back a percentage of that, or does Medicare have a – They don't pay for all services, but if they're paying for something, like diagnostic procedures, like let's say you would bill $1,000 for MRI, the Medicare schedule may say, no, we are paying $450 for that. So just stop right there. Yeah. So why is a doctor, if I'm intending to defraud Medicare, why do I not just bill for the 450 and leave it at that? Because they don't. You're supposed to bill your regular costs. Okay. But these guys, this was all fake, so why not just bill the 450 if that's all you intended to get? Well, that's a good question, but I think it's because, and I'm sure the government will have a better answer to this since they were trial counsel, but I think it's because under Medicare, my understanding is you're supposed to bill your regular charges, and you code, you know, there's medical codes. I think we all know that. You indicate the code for the procedure, and then Medicare goes and looks at the code, and they're like, okay, well, this is what we pay for that code. Okay. But if I bill 450, and that's the Medicare charge, you're not saying that I'm going to get back any less. I'll still get the 450, right? If you yes, if you billed, if you're billing the amount that's identical with the Medicare schedules, then it's going to be the same thing. It's 80 percent. So I'm just not, I'm really not hearing why, then, if you're going to bill $1,000, I recognize that there's, it's highly unlikely that you're going to get $1,000 back. But in terms of what you intended to, to, in terms of the loss you intended. Because when you bill the $1,000, you're billing it for recordkeeping, but you know that you're only going to get 80 percent of 450. And so that's, because you know, because the providers know that that's the most that they can get, that's the reality of the intent. Intent can't cover something that you know can't happen. I mean, if I, if I know that if I steal, if I know there's $1,000 in the account that I'm embezzling from, and I take that, and, and there's, that's the most I can get, and I know that, that's what I'm responsible for. In this case, even though you bill, I mean, that's probably a really bad analogy, but it's the best I can think for on the cuff. But you know, if, if I bill, if I'm, if, let's use the CJA. If, if CJA paid a percentage, CJA pays what we bill, right? And I'm, no, because I'm CJA counsel. So, you know, if, if I wanted to defraud CJA, I know that I could do so by billing more hours. So then I think, you know, whatever I billed would be fraudulent. But if they didn't do that, if they paid a percentage, and I knew they paid a percentage, if they paid me 20 percent of, of my bill, and I knew that's what I was going to get, then if I bill $10,000, my intended loss is $2,000, because I know that's all I'm going to get. Sure. But if the, if the CJA rates are cut by the judicial conference, the way we did, and you suddenly bill 20 percent more hours because you think I'm entitled to the money, so I'm going to make it up, your intended loss is not what you got. It's the full hourly billing, right? I mean, I'm just saying that, yeah, but, but, you know, these guys also had the right to go after the patients for the 20 percent. And, you know, why wouldn't the sentencing judge be entitled to think, you know, under some circumstances, these guys might have even gone after some of the poor patients and tried to get some degree of money out of them. But we're way over your time, so you have a co-counsel that's going to pick this issue up. You're right. Thank you, Your Honor. Thank you for your time. Good morning. May it please the Court, I'm Jean Hobler. I represent the United States in this matter. I'd like to clarify a couple of things that were going on in that argument. One is the papers that Dr. Popov submitted state that the district court clearly erred in calculating the loss. So I don't think we're actually arguing about what the law is or what the law should be. I think the argument was that the district court should be calculating the loss. Well, and I fully intend to address that, Your Honor. I just wanted to clarify that from the prior argument, that I don't think that they put in their papers that this is an issue of what the law is. They said that the district court clearly erred on the facts. But as to the law, I would like to note that the 2007 guidelines were used here, and those guidelines indicate that an insurance fraud in which the claim exceeded the insured value would be the measure of intended loss between intended and actual loss, particularly in the context of losses that are impossible or unlikely. In fact, the Miller-Iswail and Sutton tests go back to that example, because that example from the guidelines doesn't say anything about what the defendant knew. So let me just give you the hypo that I think would be directly analogous here. You know, the insurance policy is capped. It's a $25,000 limit. I'm going to defraud the insurance company by submitting a false claim, and I put in for $100,000, but I know that the policy max is $25,000. You're saying that in that scenario, the defendant's intended loss is $100,000? Your Honor, I think that the law says the intended loss is $100,000. I think that always, always the guideline example says, because it doesn't address what the defendant's knowledge was. Right. And I think the defendant can always come forward with that knowledge. I think that's what it says. Okay. So he comes forward and says, hey, no, I knew that the policy limit was $25,000, and that's all I intended to give, all I intended to get. You would say the intended loss is $25,000 there? I think an argument could be made for that, depending on the facts. An argument can always be made. Right. The answer to the question was not, can an argument be made, it's what do you think the answer is. And I think that what is what I would distinguish in this case, and with your hypothetical, is what is the evidence we're talking about? Is the evidence everybody knows you can't get over the policy limits? Because that's the argument that Dr. Popov is making. Not Dr. Prakash, but Dr. Popov, because Dr. Prakash did say present more evidence on that issue. He presented more evidence, but his evidence, too. And I want to reserve that for Dr. Prakash's argument. But I think that Mr. Ferrari will address that. On your plea agreements, you only assessed the Medicaid reimbursement loss to people who pled guilty, right? In general, yes. Because you recognize that that's a reality out there, that people are not getting 100 percent of what they bill. Well, and I think that it's also because we have an incentive to enter into plea bargains. It's totally understandable. I'm not saying they were punished for going to trial, but, you know, it is fairly well known in the legal community and the medical community that you don't get 100 percent of what you bill with Medicare. Right. And I think where I would distinguish that general presumption from the facts in this case is, Dr. Polpoff did not know if they were billing $1,000. He did not know if the allowed amount for that procedure was $450, and he did not know how much they were getting back from Medicare. The evidence that they relied on below, and I will note for the record that they cited the Miller case below as the standard for the district court, the evidence below was everybody knows this, therefore, in this fraud, in this case, I must not have intended the $2.2 million. And I don't think that that's the law. The law is what did this defendant know about the billings in this case, and what did he intend about the billings in this case. And what he intended about the billings in this case, we can understand by the fact that the Medicare peer review analysis showed that he was billing very unusual procedures at extremely high rates, and those were the things he was reviewing the charts to sign off on. So I'm just going to understand your argument. So the answer to my hypothetical is that the defendant who knows the insurance policy is capped at $25,000, if he's able to come in and prove that, $25,000 is the intended loss. Your argument here is just that they didn't come forward with enough evidence that these particular defendants knew that they weren't going to get the full amount? And I think that's accurate, Your Honor. You look at some of the cases that have been cited, the Natchini case, the doctors in that case were receiving the Medicare remittances. They saw what was being billed in their name. They saw what the allowed amount was. They saw what they were getting paid. There's no evidence in this case that Dr. Popov ever saw the billing or ever inquired about the billing or ever knew what the billing was. He signed what he was asked to sign. He signed blank forms. He did everything that was possible to enable his co-defendants to bill as much as possible to Medicare. Do you think the district court made a specific factual finding rejecting their attempt to rebut the presumption? I think that what was argued in the sentencing papers was that the intended loss was the billed amount. The rebuttal to that was Dr. Popov knew, as all medical care or Medicare providers know, that he would not get the full amount. Because he had prior experience billing with Medicare. And I think that was in the record as well. Right. That's a little bit more than just, well, everybody knows. I mean, he did he was able to point to his specific past experience. Well, I will say that in the district court, they did not cite any specific testimony or make it that explicit. The argument was much more everybody knows. It wasn't evidence. It was argument. It was argument. And I will note. Isn't that the point in the Singh case and the Israel case? It says about in the Singh case, Singh was intimately familiar with the billing procedures of the practice. It does not require a leap of faith to infer that he knew full well that he would not be entirely reimbursed on his billing claims. Indeed, quote from another case, it is common knowledge that Medicare and private insurers pay fixed rates for medical procedures. Even patients know that the amounts billed to insurance companies and Medicare by health care providers are higher than the fixed amounts paid. Because of Singh's status as a physician and one familiar with the billings and receipts of his medical practice, an inference surely can be drawn here, as it could not be drawn in Ravello, of the loss he intended to cause through the fraudulent scheme. It doesn't say that, it says any doctor, even a patient knows. But it's certainly an inference, which it was somewhat of what I was suggesting in my questions in this find out. There's got to be, he knows, everybody knows, I say, even the patients know, that the amount you put in isn't the amount you're going to collect and isn't the amount you intend to collect. Well, I think that that is the general idea out there, and I think it is true that Medicare doesn't generally pay. I think in the Singh case the second circuit is, which is one of my favorite circuits.  The second circuit is that Dr. Popov was not directly involved with the billing practices in his medical practice, and it was a legitimate medical practice. It was people he went and worked with every day, and he asked the billing office to please generate productivity reports. He knew exactly what was being billed and was describing that. He knew what was being billed, but he didn't expect to get that. Well, and I think that's distinguished from this case in which Dr. Popov has put forward no evidence that he knew what was being billed in his name in this practice. He simply signed off on utterly ridiculous procedures at an extremely high rate in order to enable his biller, who he never had any conversations with about what she was billing, to bill whatever she wanted. He was well aware that this was fraudulent and that he was enabling this practice. Well, I'm just still do you have a different answer to the reason why people bill 1,000 for something that only they're only going to get 450, or is there some reason you have to bill for the 1,000? I believe there is – I think there's a standard in the industry that you bill the same for whether you're billing Medicare or a different insurer. I'm not sure that applies in this case, since this was entirely fraudulent and they were only billing Medicare. That's what I mean. So if I just bill for 450 because I want to be – I want to make clear that I'm only billing, you know, the allowed amount, that sets off a red flag because everyone says, hey, this person's only billing 450. We all know that's a $1,000 procedure. What's wrong with this? Let's go investigate. Is that why people bill for 1,000? Is that why – in order to stay under the radar? I mean, what – these people are – this is all made up, right? It's not like there are real medical procedures happening here. So if they know they're only going to get 450, why do they even bother billing for 1,000? Well, and, Your Honor, I'm not sure that they were so egregiously off in the amounts they billed and the allowed amounts in this case. I don't think that's something that's been briefed or analyzed by anyone in this case. I do think that the percentages are about 60 percent between the billed amount and the allowed amount. But as we pointed out in our papers, the denied claims kind of skew those numbers. Roberts, can I ask you about the denied claims? Certainly. I don't remember what exhibit it is, but there's an exhibit that has every claim, let's say, that Dr. Papa submitted, and it shows what the allowed amount is for a particular procedure. And so we got – we have a total for the claims that were actually paid, the difference between, you know, the total submitted and the allowed amount. How come we don't have that for the unpaid claims? Why don't we have the allowed amount for the unpaid claims? Well, Your Honor, I think that if – I think it simply wasn't briefed below. I think if you look at the paid claims versus the wholly denied claims, and you look at the same percentage, then you come up with, under any theory, over a million dollars, and the district court is correct. But on the – let's say that we were going to – we held that the only intended loss here is the allowed amount. You have an argument that, well, that doesn't even matter, because if you combine the two doctors, you still get over a million. But the figure I remember is that you only added up the allowed amount for the claims that were paid, and that gets you to, like, 775 or something, something short of a million. And then, so I, okay, we'll have my law clerk go figure out how much for the claims that were wholly denied, what was the allowed amount on that, and they – he says there's no figure. You just zeroed it out, and I don't understand why. Why don't we know what the allowed amount was for the denied claim? Because on those Medicare, on those exhibits, it simply – if it was denied, it simply had zeros after the billed amount. But you're saying that there's a chart that says for this procedure, this is how much Medicare pays. So why can't you just still figure out what the allowed amount is? I think it could be done, Your Honor. I think it just hasn't been done in this case. Do you know what the figure is? I can tell you what the extrapolated figure is, but no, I do not know the figure. Okay. Yes. So just one other point I would like to make in terms of what the law is in this case is the current guidelines actually have the Miller test incorporated in them.  So we are dealing with the 2007 guidelines in this case. I just don't want the Court to be unaware of that in looking at this issue. Your time is more than up. I'm sorry? Your time is more than up. Oh, I'm sorry. I thought it was counting down still. My apologies. Thank you very much. I didn't notice that either. I thought it was counting down. It's like asking for more than you intend to get. Which is the other case in which we're going to argue that issue? Do you want to go next, then? Yes. Let's stay on that one. Yes. May it please the Court, my name is James Spertus, and I represented Dr. Prakash at sentencing, and there is some overlap between the issues raised on appeal for Dr. Prakash and Dr. Popoff. I want to just lead off by just answering Judge Watford's question directly regarding why do doctors bill a higher amount than the allowed amount? That answer came from the government's expert, Medicare expert at trial, and it's clear. Medicare requires it. It's mandatory. If there is a ordinary and customary billing amount in the office that's submitting the bills, you are not allowed to bill Medicare less. This is a totally fake operation. So this is, we're not talking about a real doctor's office. They're just setting this up purely for the purposes of fraud, right? No. Dr. Prakash had a real billing office. His participation in the clinic, the government successfully argued that the clinic's practice was fabricated. Right. Dr. Prakash had customary rates. He is a doctor. He practices. He treats patients and does get But he had no involvement in the billing coming out of the Sacramento office. Correct. So those people in that office, that's what I'm saying, they're running the show. They're generating these fake bills basically to send off to Medicare. Why do they even bother submitting the bill for $1,000 when they know, and supposing your client knows, you're only going to get $450? Well, the Medicare expects bills to be submitted at a doctor's, even though the Court is saying there was no practice of medicine at the clinic, a doctor's practice bills at a much higher rate. The Medicare's scheduled amount is significantly lower, and doctors agree to that by contract when they agree. So if they billed it $450, that would basically set off red flags for the fraud investigators? Perhaps, yes. And that was all done by E. Gazarian, who was a defendant who handled the billing for all three clinics, and it was completely unknown to the doctors how the billing was administrated. But on the issue of whether or not any of the doctors expected the billed amount to be paid, the answer is unequivocally no. And the law does require that the intended loss be determined, and that's the primary deficiency with the sentencing for Dr. Prakash, is that this Court just did not make the required findings. But if it's a deficiency about why it shouldn't have been $2.1 million, what — why should your client get the benefit of the doubt about these denied claims? I mean, he doesn't know what's going to be accepted and what's going to be denied when he submits them. Why wouldn't he have expected to get the same reimbursement rate that Dr. Le Chabrier got, which was about 46, 47 percent, in which case 47 percent of $2.1 million still gives us the same sentencing guideline range? For whatever reason, the government chose not to pursue the wholly denied claims. They were not an issue because they were never advanced by the government, as a law theory. They do bear the burden, although there's a prima facie — if a defendant does nothing, then the government is allowed to look to the billed amount to determine the loss amount. There's no other evidence for a court to consider it. But finding that a defendant rebutted the — put forth evidence so that it's improper now to rely on the prima facie showing, that doesn't mean that there's still a presumption in favor of the billed amount. It means that the prima facie basis for the loss calculation doesn't apply. I mean, I'm — let's say that we're with you on that, and we — let's say we adopt wholesale your argument, and we say — not wholesale, but we adopt your argument to the extent that we say only the allowed amount is the intended loss, right? Goldstein, we give you that. Goldstein, yes. Aren't we going to have to include the allowed amount for all of the claims, paid and unpaid? No. No. Why not? Because Medicare does what Medicare does, as the government's expert testified at trial regarding claims, and they disallow claims all the time. Doctors expect that. There's — the government could have shown, if it sought to include the wholly denied claims to calculate loss, they could have shown why they were not paid. It could be, for example, that Medicare just doesn't pay for some procedure or some test. There are things that a doctor will bill for, and the doctor's bill must be generated as it would in the customary practice and includes items that perhaps Medicare just doesn't pay. That doesn't mean that there is a scheduled amount for the items that they're skipping over. This goes directly to the government. In that case, then, I would say the intended loss is the 100 percent of the billed amount. If there's no allowed amount, you're not going to get — I don't see any scenario in which your client is going to get no — you're not going to get charged at all with the intended loss for the billed amount for claims that got denied where there's no schedule. No, but there has to be some factual basis for the denial that the government has to put in the record. We're talking — we're not talking actual loss. We're talking intended loss. Right. So unless your client comes forward and somehow proves, oh, yeah, I sent that bill for $500 for that procedure that got denied outright, but I never intended to get paid on the claim, well, then why did you send the bill? No, no, no. There's a bill that might — and first of all, we're in the world of speculation now, so I do want to highlight, because the government has not factually developed why claims were not allowed. But if I submit in a practice a bill for the quality of leather on a chair or something, obviously Medicare won't pay that. But if I bill all my clients for a percentage of overhead, I have to bill that to Medicare, and that claim will be wholly disallowed. Just take this scenario. You bill for a procedure — I don't know what it is, some made-up procedure. It's $1,000 is what your customary charge is. You send it to Medicare, and they deny it because, hey, we just don't pay for this period. There's not no — there's no allowed amount. We just don't pay it. Right. You're saying that that doesn't count toward intended loss? I'm saying the government may seek to include it if they choose, and they chose not to in this case. They have not pursued — They did — they included the entire billed amount for everything, as I understand it, paid and unpaid. And then it's your — it burden shifts to your client to rebut the presumption that arises that he didn't intend the loss. My understanding of their briefing is that they did not submit the billed amount for entirely disallowed claims. I read their briefing that they are saying even if we're correct that per cash should be paid the scheduled amount for loss, there are claims that we would add to that pile that we didn't add. So that $2.2 million figure only includes the billed — the full billed amount for paid claims? Yes. That's my understanding. Okay. And that's a major point. I mean, the Court — I think there's a set of claims that the government never factually developed because they just were never paid at all, and the government left them off the table. I guess they felt that they were over the $1 million, so why pursue them? But that goes to the government's burden. And if they abandoned claims they could make, I don't think we should speculate as to why those wholly denied claims were not included. Well, that brings me to a question that — which is what is your solution to this problem now? Are you asking for a remand, for a rehearing on the issue of the amounts? Yes, absolutely. I'm asking for remand for the district court to make findings that the district court did not make on three issues that pertain to loss. One of them is the billed amount and paid amount. And I really want to highlight for the Court, Your Honor made a point that, of course, the defendants weren't punished for going to trial. They were punished for going to trial because the paradigm for loss was different for every defendant who pled guilty, both before and after the trial. And the three defendants only, the only defendants where the government is seeking the billed amount as the loss paradigm were the three defendants that went to trial. There was a fugitive, for example, who was found after trial who pled guilty and was given the paid amount. And I think that's very important for the Court to see that since only three defendants faced this loss paradigm, they lost more than the acceptance of responsibility points that they should have lost. They also were subjected to a different loss calculation. It depends on what the baseline for legality is. If the baseline for legality is they get to tag your client with the full billed amount and that's just what the law allows, the fact that they cut a break to some people who plead guilty, that's not a violation. People get lesser drug amounts all the time when they plead guilty, even though they had more drugs than the people who go to trial. I don't think that's allowed. I think that that's the disparity issue. It's fine to say that. It's the real world. Well, but to create a disparity between a pool of defendants who elect to forfeit acceptance of responsibility and go to trial, there was nothing that was revealed in trial that bore on the paid amount, loss amount issue. The only thing that was developed at trial were the mechanics of how this fraud was done, but the government knew the paid amount and billed amounts before the trial started. So I do think that you started saying you want three things. You said one, billed amount and paid amount. Two, the government's theory of guilt involved that these defendants planned never to collect the 20 percent copay. The third was the foreseeability of Dr. Popoff's billing. I know I'm running out of time, but those are the things you want remanded for the sentencing judge to specify, make findings about. Yes. I think that we were entitled to the findings. The transcript of the sentencing hearing reveals how I struggled to get findings that ultimately the court just concluded he believed the government's calculations were correct and sentenced Dr. Prakash to the statutory maximum. I don't think the guideline top of the guideline range. Well, the court and the government argued that that was the statutory maximum. Okay. I'm deferring to them on that.  And I do want to highlight for the court. So on the evidence submitted, not a new sentencing hearing? No, a new sentencing hearing. Okay. To make findings. And there is authority. It's Singh and Isawal for if the court requires the defendant himself to provide testimony, we would do that. Obviously, we thought we had more than sufficiently rebutted any presumption in this case because we had an expert, we had an eyewitness to Dr. Prakash's billing practices in his office. The government's Medicare contract came out at trial. And the government expert at trial was very compelling evidence that the paid amount should have been the proper loss calculation. So with that volume of evidence, I think that we more than rebutted the prima facie loss calculation should not have been used. And I think that the court should make findings on why it went to the billed amount as opposed to the paid amount for Dr. Prakash, given our evidentiary presentation. I'm out of time. I thank your Court, Your Honors, for the time. Thank you, counsel. Good morning, Your Honors. Phil Ferrari to the United States. I want to start with something Judge Watford was talking about. It's absolutely the case that we were seeking to hold this defendant liable for the denied claims. Those denied claims are within the billed claims. The $2.2 million? That's correct, Your Honor. That's not just paid claims. Those are all the claims, paid and denied. So why don't we have an allowed amount for the denied claims? The reason is what we introduced at trial was the records kept by Medicare with respect to each of the claims submitted. And Medicare, when it denies a claim and is going to pay nothing on it, doesn't generate an allowed claim. And what are some of the reasons why the claims were denied? Were they simply too many per patient? Were they fantasies, things that Medicaid never pays for, or what? Well, Your Honor, there was some evidence at trial as to why certain claims were denied. And that evidence was that with respect to certain patients, there was a code called PR-49, where Medicare would pick up on the fact that this patient is going to too many doctors, or this patient is having this claim billed too many times, and it's an indication of fraud, and therefore, with respect to this patient, we're not going to pay that claim. And that was something that multiple witnesses testified. Once they knew somebody was getting what they called PR-49, then they'd stop accepting that. And under Judge Watford's analysis, those would certainly count as intended loss, because if you're not caught, you're going to get paid. Correct, Your Honor. What are some of the other reasons, then, why a claim would be denied? Well, we also know that basically what ended up happening with respect to each one of these clinics, so they moved from Richmond, I mean, sorry, Sacramento to Richmond to Carmichael. Essentially, it became harder with these doctors' billing numbers to get claims paid. We know that with respect to Dr. LeShabray in particular, at the Richmond clinic, she was put on something called prepayment review by Medicare, where they say, instead of looking at the particular patient, we're going to look at the doctor. The claims you're submitting are making us think that there's fraud here, so now we're not going to pay a single claim for you unless you actually give us the underlying documentation first, and we can look at it before we pay it. So there was evidence at trial that to the extent claims were getting denied, it wasn't because they were just these outlandish, crazy claims that Medicare would never pay. It's because, based upon the practices of these clinics, it was becoming evident that there was fraud here. Let me ask you this. Let's say that we accept their argument that the allowed amount is the intended loss, and that they never intended to get the 20 percent from the patients because there's no evidence that they ever went after the patients. So it's 80 percent of the allowed amount is what the – I mean, let's say that that's the intended loss. Is your argument that we still get over a million if you combine the two doctors together? I think, well, well, if we combine the doctors and if you take 80 percent of the allowed amounts and we extrapolate, and that's necessary because, as we've discussed You don't have – okay. So on this record, we could not just say, you know what, if there was error, it was harmless because it would still be over a million. We have to send it back and there would need to be the new hearing that the counsel mentioned? Well, yes. I think I would say that's right. But I would say a couple of things before we get there. And that is that even if you accept the idea that people, doctors know generally that Medicare is going to pay according to a fee schedule as opposed to amounts that are billed, there's no evidence in this record for any of the doctors that they knew what that fee schedule was. And it's absolutely the case that if you bill $450 for a service and the allowed amount is $450, that's what you'll get paid. And there's nothing in the record that indicates that that fact alone is a red flag and that, therefore, they wouldn't bill that way. The idea that my intended loss should be lowered because of the fact that there was this allowed amount, if you don't know what that allowed amount is, if you don't know the difference between the allowed amounts and the billed amounts, if you don't know if there even is a discrepancy between those two, let alone what that discrepancy might be, then the party that's trying to take advantage of a fiction here is the defendant. Because they're saying I intended something lower, they can't tell you what it is they actually intended. And for that reason, I think we think that in this case, the district court faced with the task of coming together, arriving at a reasonable estimate of what the loss was, did so, and did not abuse its discretion in doing so. Kennedy. Well, they don't need to come forward and say, I knew for, you know, an MRI of the knee that the allowed amount was $150. They can just say, look, I know whatever that allowed amount is, it's less than what I billed for, and everybody in the industry or not the industry, but everyone in the medical field knows that. That seems to me to be enough to show that, hey, whatever that allowed amount was, that's what I intended to get. Well, if you know what that allowed amount is, and if you get to the dollar, I'm just saying I know there is an allowed amount, and whatever that was, my evidence is whatever that was, that's what I was intending to get. Why isn't that enough to rebut the presumption? Because to get to the dollar, in order to get below the presumption, we don't, I don't quibble at all with your first hypothetical about the fact that if you come in and you know that, in fact, rather than $100, it's $25, that you've established that that's what I wanted to get, and therefore, using that, let's go ahead and rebut that presumption. The problem here is that they're not putting forth any evidence to rebut the presumption of the billed amount, because just because you know that Medicare is going to pay according to an allowed amount doesn't mean that you know that Medicare is going to pay for something less than what bill was submitted. That's what their evidence is. Everybody, every doctor knows, no matter what procedure you're charging for, Medicare never pays you the customary rate, right? No. That, first of all, that is not the evidence. It may be, it may well be that in general, people know that Medicare pays an allowed amount. But to make the argument that not only that, but the allowed amount is always less than the billed amounts, that's not an evidence. Well, let's say for Dr. Popoff. He says, you know, he had prior experience billing with Medicare. He comes in and says, you know what, I submitted 10,000 bills to these people, and I never got paid 100 cents on the dollar. So first of all, Dr. Popoff never said that. Dr. Popoff never said that he had plenty of experience billing Medicare. What Dr. Popoff said, I believe, in terms of during his cross-examination, he agreed that he was no stranger to Medicare, that he'd been involved in it before. But as far as having any kind of involvement in terms of actually billing Medicare, submitting billing to Medicare, that's not the record. But I'm saying if on remand he were to come in and say, I know, I can't tell you for if you give me procedure X, I'm not going to be able to tell you what the allowed amount is down to the dollar. But I can tell you in my experience, and I had years of experience dealing with these people, I never got paid 100 cents on the dollar. And I knew that there was an allowed amount for each procedure. Are you saying that that's not enough to rebut the presumption? I am saying that's not enough, because I don't be – because since he doesn't know what that allowed amount is, he's not telling you that he actually had a specific number that was different than the evidence that the government has already put before the Court in terms of this is what he actually billed. He's not able to tell you, but I thought I was going to get less than that. What he's saying is, I thought I probably could have got something different than that, but I can't tell you how it would be different. He's saying I intended to get less because I know that they don't pay 100 cents. He can't – he can't tell you that he knows – at least so far he hasn't, certainly. Nobody's come close to saying that I know I'm going to get less, because he can't establish that he knows the relationship between the allowed – what the – nobody's saying, I know what the allowed amounts are. So nobody's able to say, I know what the relationship is between the allowed amounts and the billed amounts. The other thing I want to say is that, in particular with respect to Dr. Prakash, there is no need to send this back to develop this record further. This issue was squarely put before the district court. We are – he tried to rebut the presumption, and the government argued that his efforts to do so were insufficient, and we argued that specifically before the district court at sentencing. This issue was briefed extensively. The district court made it clear that it was familiar with the party's briefings, that it had read everything, it had considered everything, and it rejected that idea. And it did so correctly, because the two pieces of evidence that Dr. Prakash put forward to try to rebut the presumption did not address Dr. Prakash's personal knowledge to begin with. Moreover, they didn't address the specific issues here, whether or not Medicare bills according to an allowed amount or what that allowed amount might be, or the fact that Medicare typically will then reimburse 80 percent of that allowed amount. Is it – Kennedy, I ask you a question here, because I'm not quite sure where this leads. If he didn't know what amounts were being billed, because he relied on whoever the agent was who did the billing, why isn't the question what the agent knew about the billing, since he's the one who made up the billing amounts? I think the response to that would be twofold. But – well, actually, we can cut it in half. Assuming that there would be evidence of that in the record, then I think the answer would be that the intended loss determination, it seems to me from reading the cases, is an individualized assessment. And just because somebody else in the conspiracy might have had some knowledge that might have rebutted the presumption, there's no evidence that this defendant does, and therefore, there's no evidence that this defendant intended a different loss. Well, there's no evidence he really intended anything other than what the billing person put down. And if we're going to say that he didn't know because the one who knew was the billing person, it seems to me he may be held responsible. But you're arguing, well, he didn't know anything about billing, so he must have thought he was going to get the intended amount, and he's not the one who made up the billing. It seems you're holding him responsible for what the billing person did, but refusing to give him the knowledge of the billing person. Well, that's true. We're holding him responsible for the bill submitted on his behalf, and we're not giving him the benefit of hypothetically – hypothetical knowledge that that biller might have held. Well, not hypothetical. I mean, that biller certainly would qualify, as somebody who does this all the time, is familiar with billing practice, knows you're not going to get what you ask for, and he's the one who made up the bills. And then you say, well, the doctor, whichever the doctor is, is responsible, even though he doesn't know anything. But, in fact, it seems there's some missing gap or not missing gap, missing link that you don't give. And it's just a thought. There are some missing gaps, and I think that points towards – A missing gap is a gap. Well – You're just as bad as I am. It's a missing link. Whatever's missing, I think, actually points to sort of the difficulty here, and actually the wisdom in adopting the presumption, unless it's rebutted, that the billed amount, that when you say this is what I want to get paid, that that's what we're going to hold you accountable for. Particularly in a case like this, there are a number of reasons why that is important here. Number one is with respect to these denied claims. The defense agrees that intended is preferred over actual if it exceeds. The defense concedes that intended loss is what we should achieve to get here. But what the defense is asking for is actual loss. That's what they're arguing, is the actual amount paid. We've put you well over also. I'm sorry? I said we've put you well over the time also. Okay. Thank you very much. Now we've got one more. Yes, Mr. Taylor. 30 seconds, absolutely. You want to fix the clock for 30 seconds? I just want to address that we, in fact, put in affirmative evidence that the intended loss was whatever Medicare paid. And that was through the declaration of Nicholson and an employee of Dr. Prakash who testified to words Dr. Prakash spoke to him. So I want to just refute the government's point that we failed to meet our evidentiary burden. And the point is that the state of mind, the intended loss was whatever Medicare will pay for these claims is what we intend to obtain. That's the paradigm we presented at sentencing. And the district court did not make findings on that. Thank you. Thank you, Justice. All right. You're going to talk about something different. That's right. She didn't raise that. Good morning. May it please the Court. My name is Cresta Daly, and I represent Dr. Lana Le Chabrier. Can I ask you just a question that's right on that? I'm dying to know the answer, since you didn't file a reply brief, am I right? Correct. So do you agree with the government that you've – your client has waived that Speedy Trial Act argument by not filing a motion to dismiss? I think we would have to concede that point, that she has waived that argument. Okay. Talk about something other than that. I would like to talk about something other than that. What's your favorite subject for this morning? I'm sorry, Your Honor? Go ahead. Approximately three and a half or four weeks prior to trial, trial counsel in this case received a witness statement. And in that witness statement, that witness discussed the fact that he was a cooperating witness. And the cooperating witness discussed that he had reviewed some evidence that suggested that his signatures had been forged on a number of documents. It was at that time that trial counsel first – it first occurred to him that perhaps he needed to retain the assistance of a handwriting expert. Trial counsel did proceed to attempt to do that. He was a CJA counsel, so he submitted a funding request, I think within four or five days of receiving the evidence. It took nearly two weeks for that funding request to be approved. And by the time he had located the expert and had the expert review the relevant handwriting evidence, trial was well underway. During the course of the trial, he asked the trial for a one-day continuance so that this expert might testify. And the evidence that this expert intended to testify about pertained largely to the conspiracy charge because much of the evidence pertained to the anticipated clinic that was going to be opened in Burbank. The expert would have testified that many of the documents pertaining to Burbank either did not contain Dr. Le Chabrier's handwriting or they did not contain her signature. And it was this evidence that the government argued in their closing that was part of the reason why she was convicted of the conspiracy count. Well, it couldn't – could not have helped that when she was interviewed by the FBI that she admitted she signed a lot of the key documents. She admitted she signed some records. She was sort of vague about specifically which documents she said she signed. She said she submitted a number of forms. She said she – Cumberbatch being more specific than that. She signed some Medicare forms. But the law has clearly held – and, in fact, this Court has held in a case called or confesses that they are guilty, that that does not absolve a lawyer's obligation to properly and adequately investigate. Roberts, I know, I mean, I grant you that. And let's say that we agree that counsel was deficient in not pursuing this earlier. I'm just saying I really have a hard time seeing how this expert's proposed testimony would have made a difference, given what your claim has already said. Because I think she probably – I think it's most relevant to the conspiracy charge, because she doesn't say in her – when she was interviewed by the FBI, she doesn't say, I signed documents pertaining to the Burbank Clinic. And it was the documents pertaining to the Burbank Clinic that the government relied on in their closing argument as to Dr. Le Chabrier. I thought – I mean, I'm not as familiar with the Burbank Clinic, because I understand her involvement in terms of the fraudulent billings that came out of the Richmond Clinic. And I thought she admitted that with respect to that operation, yeah, I did sign these She admits some of those, but I think there was – she had a very good argument that she was not a member of the conspiracy, that she was just – her argument essentially at trial was that she was duped into signing these documents and that she was unaware and taken advantage of. And I think had this handwriting expert been allowed to testify, it would have bolstered trial counsel's argument that she was duped and taken advantage of. I guess if he had been – was it a he or she? I don't know. It was a he. A he. If he had been prepared to say that, you know, all of the documents contained forged signatures, but he wasn't even prepared to do that. I don't think he – that's correct. I don't think he was prepared to do that. The record is somewhat unclear as to precisely which documents he examined. Right. He – in fact, he said your client signed a document that the lawyer got up in closing argument to say was a forgery. I mean, you know, she testified. She could have testified that this is a forgery. This is a forgery. This is a forgery. But what good would it have done her in that – in the circumstances there? I mean, it's a conspiracy. As you say, the witness said, yeah, my signature was forged on some of the – some of these documents, but he pled guilty and he testified for the government. I mean, it's not like it's inconsistent with guilt in the conspiracy. I don't think it would have bolstered her argument that she was taken advantage of by the main people who were at the center of this conspiracy, Mr. Petrosian and some of the others. It would have given her counsel a much better – much better evidence to argue, much more – it would have developed the record more fully as to her lack of knowledge as to specific aspects of this conspiracy. And I do think that trial counsel's failure to examine these records was then further compounded by the fact that she had requested on multiple occasions that her trial be severed from that of her co-defendants. And I think looking backwards, that error is clearer than it was at the time when the trial court and when this Court initially considered that, because it was impossible for anyone to look forward into the future and see that this was the issue that was going to arise at trial. Thank you. I'll reserve the remainder of my time. Thank you. Good morning, again, Your Honor. Phil Ferrari for the United States. This – well, first of all, as I think the district court made clear on the record in the middle of the trial when this continuance was requested, while reference was made to a one-day continuance, it was pretty clear that this would not have actually been a one-day continuance, that there was a likelihood that it would have extended for much longer than that. And I think indicative of that is this idea that there's confusion over what the proposed expert was going to testify about in the first place. When this request was made after the government had rested, we didn't even have – and we still don't have – an actual report from this expert. What we had was a series of bench notes. And I actually think that, Your Honor, it's correct that defense counsel actually argued that the signature on the Burbank application was a forgery. I don't – and the expert's bench notes, when you look at them, are inconsistent with that. I don't think counsel did that knowingly. I think that he just actually hadn't had time to get through those bench notes and understand what was in those bench notes. I think that's indicative of the fact that this was not at all developed, and the idea that this could have been just a single-day continuance was not realistic. But I also think that goes further. Now that we do know, now that we can compare the actual bench notes to the actual exhibits which the government submitted in its excerpts of record, it – make it clear that this expert would not have made a difference, that consistent with her statement to the FBI that, in fact, she had signed Medicare documents, consistent with her statement to her own counsel that, yes, she had signed the documents. The expert, he doesn't state that she did not sign the application for the Richmond Clinic. He actually states that it's an admitted known signature on the document relating to the Richmond Clinic which allows for funds to be put into her bank account from Medicare. This case is not Duncan. Counsel referred to the Duncan case where there was a failure for the attorney there to investigate. In that case, the defendant actually said, look, I didn't kill the person, but I was there. And there was blood on the scene that did not belong to the victim. And so there's a potential that if he didn't kill the person but he was there, the only way that's true is if somebody else is there. This case might be like Duncan if in Duncan he – the defendant had told the counsel, well, that is my blood. And then for some reason, counsel was held responsible for not investigating actually whether or not it was the client's blood. Here she said, I signed the documents. And so the district court was very clear. I want to make this point as well. This issue was put before the district court in a new trial motion following trial. And that's significant for two reasons. First and foremost, the district court was very clear that it was not faulting counsel for not investigating this, for not retaining an expert. The district court instead, when he made the comments he did in the middle of the trial saying, well, that's one of the first things I would have looked at, what he was pointing out was that, hey, there's not been some diligence here if this is actually a meritorious request. But the court also noted the fact that he was relying on what his own client told him about whether or not those were forgeries there. And as we point out, that's not necessarily inconsistent with her defense. I mean, she's admitting she signed certain Medicare documents. The other thing that I think is significant about the fact that this was raised at a new trial motion is the ineffective assistance claim I think has been developed. Trial counsel was relieved immediately after trial. So there was new counsel at the new trial motion. It appears that Dr. Le Chabrier thinks that this claim has been developed enough for this court to pass on it. And so we would urge the court to do so. Thank you, counsel. The case just argued will be submissive. She has some rebuttal time. I bet she didn't look like she was going to take it. You want to use it? I thought she was just gathering her pages. Oh, okay. Thank you, Your Honor. I would just like to address a few things that the government stated. The issue of the one-day continuance, that's all that the defense counsel was asking for, was a one-day continuance of this matter. And it would have been sufficient for the expert to come and testify. Counsel for the government made some reference to some statements that Dr. Le Chabrier allegedly made to trial counsel. I don't think there's anything in the record regarding what Dr. Le Chabrier did or did not say to her counsel. And I think it's quite clear that the district court found that trial counsel, as was stated, was less than diligent in his investigation of this case. And that lack of diligence, I think, did play into the jury's verdict in this case, and specifically the finding that she was guilty on this conspiracy count. Thank you. Thank you. Case is just argued, will be submitted.
judges: Lasnik, Reinhardt, Watford